UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| W.O., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>ANDREW G. BESHEAR, in his Official<br>Capacity as Governor of Kentucky,<br><br>    Defendant. | Civil No. 3:20-cv-00023-GFVT<br><br><br>**OPINION**<br>**&**<br>**ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

At many different levels, the coronavirus pandemic has required a swift and evolving response. And just as medical and governmental actors modify and refine their response to the pandemic, courts must adjust to the ever-changing legal landscape these responses create. The present case alone has seen the addition of two new private plaintiffs, dismissal of the original plaintiff, the recent intervention of the Attorney General as Plaintiff, and, now, the rescission and replacement of the very Executive Orders Plaintiffs sought to challenge. The parties recently requested, and the Court has granted, additional time to determine if a constitutional challenge is still necessary. [*See* R. 36.] But before proceeding any further, one preliminary issue remains to be addressed: the standing of the parties to bring suit.

**I**

Shortly after the coronavirus pandemic reached the United States, Kentucky Governor Andrew Beshear began issuing a series of executive orders aimed at limiting social interaction between Kentuckians. As part of these efforts, on March 30 and April 2, 2020, respectively, Governor Beshear issued two separate executive orders which, in relevant part, instructed

Kentuckians to refrain from travel interstate and non-Kentucky residents to refrain from travelling into Kentucky. Executive Orders 2020-258 and 2020-266. Under those previous Travel Orders, Kentucky residents returning to the state and non-Kentucky residents entering the state were required to self-quarantine for fourteen days. [*Id.*; R. 34 at 2.]

Following numerous legal challenges to the previous Travel Orders, in this Court and others,[1] Governor Beshear issued a new Executive Order, No. 2020-315 (hereinafter the "Third Travel Order"). [R. 35-2.] This Third Travel Order rescinded the previous Travel Orders[2] and replaced the mandatory language related to travel and self-quarantining with more permissive language. [*See* R. 35.] This brings the Court to the positions of the respective Plaintiffs.

Plaintiffs W.O. and M.O. are a married couple and residents of Kentucky whose children and grandchildren reside out of state, in Kansas and Texas. [R. 9 at ¶ 5–6.] At the beginning of this suit, W.O. and M.O alleged that they regularly engaged in, and had plans to continue engaging in, interstate travel that was proscribed by the previous Travel Orders. *Id.* at ¶ 35. However, following issuance of the previous Travel Orders, W.O. and M.O were concerned they would be prosecuted if they followed through with those plans. *Id.* at ¶ 36.

Attorney General Cameron's position as Plaintiff is different; he seeks to sue "on behalf of the people of Kentucky . . . ." [R. 23 at 2.] The Court has found, as a procedural matter, that the Attorney General may do so. [*See* R. 34.] However, the Court expressly reserved ruling on whether, as a constitutional matter, the Attorney General can establish federal standing. In light of the recent developments in this case, the Court will now address this standing issue as it

---

[1] In *Roberts v. Neace*, No. 2:20-CV-054 (WOB-CJS), 2020 WL 2115358, at *1 (E.D. Ky. May 4, 2020), the court found that the previous Travel Orders were likely unconstitutional and therefore granted a preliminary injunction prohibiting their enforcement.

[2] Technically, only Executive Order 2020-058 was rescinded in its entirety; only the provisions of Executive Order 2020-266 which related to travel were rescinded—the remaining provisions remain in effect. *See* Executive Order 2020-315.

2

relates to both the Attorney General and the private Plaintiffs.

**II**

It is well-established that standing is a threshold inquiry in every federal case. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987). Each federal court is "under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations and citation omitted). Plaintiffs must clear this "qualifying hurdle . . . even if raised *sua sponte* by the court." *Cmty. First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994).

"To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (citations omitted). To show injury in fact, a plaintiff's injury must be both particularized and concrete. *Spokeo v. Robins*, 136 S. Ct. 1540 (2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). A "concrete" injury is a *de facto* injury that actually exists. *Id.* Finally, "a plaintiff must also establish, as a prudential matter, that he or she is the proper proponent of the rights on which the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations omitted).

**A**

Attorney General Cameron, "as the lawyer for the people of Kentucky," recently intervened as Plaintiff in order to challenge the constitutionality of Governor Beshear's Travel Orders. [R. 33 at 2; R. 34.] The present question is whether, as a constitutional matter, he can establish federal standing to do so. In short, the answer is yes.

**1**

Federal courts rarely encounter lawsuits brought by one state official against another. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 260 (2011) (hereinafter "*VOPA*"). In fact the Supreme Court, in *VOPA*, recently acknowledged the novelty when faced with such a suit. *Id.* at 250, 260. In that case, an independent state agency brought suit against certain state officials in their official capacities for alleged violations of federal law in the administration of state-run mental hospitals. *Id.* at 250–52. And, there, the *VOPA* court considered a question which, on review, bears directly on the present standing analysis: whether the state agency could invoke the *Ex parte Young* exception to sovereign immunity in order to bring suit against the fellow state officials. *Id.* at 254–61. The *VOPA* court concluded the state agency could invoke the exception, but that it needed two things to do so: "a federal right that it possesses against its parent State; and . . . authority to sue other state officials to enforce that right, free from any internal veto wielded by the state government." *Id.* at 260–61.

In this case, the issue of sovereign immunity has not been raised.[3] But, at a fundamental level, the question before this Court is remarkably similar to the question before the court in *VOPA*: when can one state actor bring suit in federal court against a fellow state official in order

---

[3] In another case challenging Governor Beshear's recent executive orders, *Maryville Baptist Church, Inc. v. Beshear*, the Sixth Circuit similarly recognized that sovereign immunity was not raised as a defense. No. 20-5427, 2020 WL 2111316, at *3 (6th Cir. May 2, 2020).

4

to protect the interests of the state? So, by logical extension, the requirements set forth in *VOPA* related to sovereign immunity bear upon the closely related issue of standing. The first *VOPA* requirement, that the state actor possess "a federal right . . . against its parent State," speaks to the need for the party bringing suit to have a legitimate basis for entry into federal court. And, at a more basic level, it is also an important acknowledgement that a state actor may have standing to bring suit seeking prospective relief against a fellow state actor in order to vindicate the federal right. *See VOPA*, 563 U.S. at 255 (citing *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 105). The second requirement, that the state actor have the "authority to sue other state officials to enforce that right," speaks to the need to look to state law to determine who is allowed to bring suit on behalf of the state. *Id.* at 261 ("[T]he latter [condition] cannot exist without the consent of the State that created the agency and defined its powers."); *see also Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013). Given the manifest applicability of these requirements as it relates to the present standing analysis, the Court will consider whether the Attorney General can meet each requirement in order to establish standing.

   The "possession of a federal right against the parent State" requirement is easily met. The Attorney General, in challenging the various travel orders, argues that Governor Beshear has "overstepped the Constitution" and violated the "fundamental right of every Kentucky citizen to interstate travel." [R. 23 at 2.] This federal right, also described as "the 'constitutional right to travel from one State to another[,]' is firmly embedded in our jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (citing *United States v. Guest*, 383 U.S. 745, 757 (1966)). And, like the rights at issue in the *VOPA* action, the federal right the Attorney General now seeks to vindicate ultimately exists to protect and advance the interests of individual citizens. *See VOPA*, 563 U.S. at 250 (2011).

The second requirement, that the Attorney General have the authority to sue other state officials to enforce the federal right, requires a slightly more involved analysis. On this issue, the Court must look to Kentucky law. *Id.* at 261; *see also Hollingsworth*, 570 U.S. 693, 710 ("To vindicate [its] interest[s] . . . a State must be able to designate agents to represent it in federal court."). Here, after looking to Kentucky law, it is clear that the Attorney General also meets this requirement.

In fact, the Kentucky Supreme Court recently addressed this exact question. In *Commonwealth ex rel. Beshear v. Bevin*, the Kentucky Attorney General sought to enjoin certain of the Governor's actions as unconstitutional. 498 S.W.3d 355 (Ky. 2016). After review of the applicable state statutory and constitutional provisions, as well as the common law powers of the Attorney General, the court held unequivocally that the Attorney General had "the power to initiate a suit questioning the constitutionality or legality of an executive action." *Id.* at 363 (citing *Commonwealth ex rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (Ky.1974)). The court explained further that the Attorney General as "chief law officer of the Commonwealth . . . is uniquely suited to challenge the legality and constitutionality of an executive . . . action as a check on an allegedly unauthorized exercise of power." *Id.* at 365 (citation omitted). Kentucky law could not be clearer on the issue of which state officer has the power to sue on behalf of the state in the present circumstances: it is the Attorney General. From a standing perspective, the rare procedural posture before the Court is appropriate—the Attorney General may proceed with his suit.

**B**

Whether the private Plaintiffs, W.O. and M.O, have standing is another matter. W.O. and M.O., of course, advance their own interests, not the interests of the people of Kentucky. More

specifically, W.O. and M.O. seek injunctive relief against the Governor to prevent him from inflicting irreparable harm by banning them from travelling interstate. [R. 11 at 6.] To be clear, neither the previous Travel Orders nor the Third Travel Order have been enforced against Plaintiffs. But "an actual arrest, prosecution or other enforcement action is not a prerequisite" to establish an injury-in-fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). In pre-enforcement challenges, like this one, the "Supreme Court has recognized that an allegation of future injury may satisfy the injury-in-fact requirement if the alleged threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Susan B. Anthony List*, 573 U.S. at 158 (cleaned up)). More specifically, a plaintiff satisfies the injury-in-fact requirement where he alleges: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is "proscribed by a [law]," and (3) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted). The Court will consider, in turn, whether Plaintiffs have met each element.

**1**

Although "[t]he word 'travel' is not found in the text of the Constitution. . . . the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (citing *United States v. Guest*, 383 U.S. 745, 757 (1966)). It is difficult to pin down the source of this right, but the Supreme Court has "long recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules or regulations which unreasonably burden or restrict this movement." *Id.* at 499 (citing *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969)).

Governor Beshear has not seriously disputed this. Instead, the Governor argues that Plaintiffs' constitutional right to interstate travel may be reasonably restricted to prevent the spread of disease and protect the public health. [R. 18 at 12.] Additionally, in light of the Third Travel Order, Governor Beshear argues that it is now clear there is no constitutional violation. [R. 35 at 2.] The Court does not need to decide that issue at this juncture. Presently, Plaintiffs need only show "an intention to engage in a course of conduct arguably affected with a constitutional interest[.]" *Susan B. Anthony List*, 573 U.S. at 159. Plaintiffs have been vague about impending travel plans, but say they "regularly travel out of state" and "presently desire to travel out of state" to "see family members." [R. 11 at 6.] Interstate travel is not merely "arguably affected with a constitutional interest," it is a constitutional right. Therefore the Court finds Plaintiffs have demonstrated "an intention to engage in a course of conduct arguably affected with a constitutional interest[.]" *Susan B. Anthony*, 573 U.S. at 159.

**2**

Plaintiffs must also show the course of conduct in which they intend to engage—here, interstate travel—is prohibited. In light of the Third Travel Order, whether Plaintiffs can meet this element is less clear. As noted above, the Governor rescinded the previous Travel Orders[4] and replaced them with the Third Travel Order which includes permissive, rather than mandatory, language related to travel and self-quarantining. [R. 35.] Travel in and out of the Commonwealth is still somewhat restricted, but certainly to a lesser degree than under the previous Travel Orders.[5] And, given the more permissive language, it is unclear whether

---

[4] Technically, only Executive Order 2020-058 was rescinded in its entirety; only the provisions of Executive Order 2020-266 which related to travel were rescinded—the remaining provisions remain in effect. *See* Executive Order 2020-315.

[5] Under KRS § 39A.990, violation of the recently promulgated executive orders is a Class A misdemeanor. *See also* KRS § 532.020(2); KRS § 534.040 (setting forth the penalties for a Class A misdemeanor).

Plaintiffs' intended course of conduct is technically prohibited by the Third Travel Order. But the Court need not engage in further analysis on this element given the clear failure by Plaintiffs to meet the third element—credible threat of prosecution—analyzed below. For the purpose of the analysis, the Court will assume that W.O and M.O have sufficiently demonstrated that the conduct in which they intend to engage is still proscribed by the Third Travel Order and proceed to the third element.

### 3

To show a credible threat of prosecution, the mere existence of a proscriptive law or a generalized threat is not enough. *McKay*, 823 F.3d at 868; *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1021 (9th Cir. 2012). To establish a credible threat, a plaintiff must provide some indication of imminent enforcement or prosecution as against the plaintiff. *McKay*, 823 F.3d at 868. Specifically, the Sixth Circuit has looked to whether plaintiffs can "point to some combination of the following factors" to provide an indication of imminent enforcement: "(1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged [law] that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *Id.* at 869 (internal citations omitted). Courts may also consider "a defendant's refusal to disavow enforcement of the challenged [law] against a particular plaintiff." *Id.* At this stage, even construed in the light most favorable to Plaintiffs, they fail to provide any allegation or point to any evidence which would establish any of these "*McKay* factors."[6] *See Plunderbund Media, L.L.C v. DeWine*, 753 F. App'x 362, 367 (6th Cir.

---

[6] Courts have also considered whether plaintiffs have sufficiently alleged a "subjective chill" on the exercise of their constitutional rights as part of this analysis. However, the Sixth Circuit has cast doubt on the relevancy of this factor outside of the First Amendment context, stating: "Nor does the 'chill' on the plaintiffs' *right of travel* . . . which the plaintiffs claim results from their fear of false prosecution, suffice

9

2018).

First, there is no allegation of a history of past enforcement of either the previous Travel Orders or the Third Travel Order against Plaintiffs or anyone else. Plaintiffs attempt to establish a history of enforcement by pointing to past actions taken by Governor Beshear during the pandemic. Specifically, Plaintiffs note that "Governor Beshear stationed sheriff's deputies outside the home of a man who tested positive for COVID in order to forcibly quarantine him." [R. 11 at 3 (citing Katie Shepherd, *Don't want to self-quarantine? The sheriff could send armed guards to your house*, THE WASHINGTON POST (Mar. 17, 2020), available at https://www.washingtonpost.com/nation/2020/03/17/coronavirus-kentucky-forced-quarantine/).] As noted in the cited article, however, this action was taken in concert with local officials after a Nelson County man tested positive for the novel coronavirus and then refused to self-quarantine. *See* Shepherd, *supra*. The conduct at issue there was vastly different from the conduct which Plaintiffs seek to engage in and, importantly, the enforcement actions taken were not taken pursuant to any travel order. On the whole, Plaintiffs have failed entirely to show a history of past enforcement of the previous Travel Orders or Third Travel Order against Plaintiffs or anyone else.

Second, Plaintiffs fail to allege receipt of enforcement warning letters, or any other type of warning, regarding their specific conduct. In fact, Plaintiffs explicitly stated that their fear of enforcement of the previous Travel Orders was *not* "unique to them." [R. 20 at 4.] At this stage, no further analysis of this factor is necessary.

At first glance, the factor on which Plaintiffs have the most colorable argument is the

---

for standing. Our jurisprudence assumes that only the chilling of First Amendment rights may confer standing." *White v. United States*, 601 F.3d 545, 554 (6th Cir. 2010). Regardless, consideration of this factor is inconsequential given that Plaintiffs have not provided any allegation sufficient to show a likelihood of success as to the remaining *McKay* factors.

third factor—that an attribute of the challenged law makes enforcement easier or more likely. Plaintiffs note that Governor Beshear has created the "COVID-19 Reporting Hotline" by which Kentuckians can lodge "complaints about non-compliance with coronavirus mandates." [R. 11 at 3–4 (citation omitted).] Providing such a hotline, one could argue, makes enforcement more likely as any member of the public can report conduct which potentially violates either the previous Travel Orders or the Third Travel Order. Ultimately, however, this is not enough.

The existence of the hotline falls short of establishing a likelihood of success on this third *McKay* factor for two reasons, one technical and one practical. First, as a technical matter, the hotline is not an attribute of any travel order but, instead, is a channel of communication separately created to field complaints about *any* "non-compliance with coronavirus mandates." *Id.* Second, as a practical matter, the creation of a standalone hotline to report possible noncompliance with a set of recent directives does not, in and of itself, necessarily make enforcement more likely. On this factor, courts have looked for attributes that more clearly indicate that enforcement is likely—like, for example, a provision which allowed any member of the public to initiate enforcement of a law by filing a formal grievance. *See Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014). At this juncture, Plaintiffs fail to point to any such attribute or to make any further argument as it relates to this factor.

Lastly, the Court notes that the final factor to be considered—"a defendant's refusal to disavow enforcement of the challenged [law] against a particular plaintiff"—cuts squarely against the Plaintiffs. *McKay*, 823 F.3d at 869. At no point during this litigation has Governor Beshear refused to disavow enforcement of any travel order. To the contrary, in the preliminary injunction hearing, counsel for the Governor indicated that the Travel Orders would be enforced

11

against Kentucky residents only if residents refused to self-quarantine upon return to Kentucky, not simply for leaving the state in the first instance. And, perhaps most significantly, the Governor has now issued a new executive order which expressly "allows travel into or out of the Commonwealth of Kentucky" and simply *asks* any individual entering Kentucky with the intent to stay to self-quarantine for fourteen days. Executive Order 2020-315.

Because Plaintiffs have failed to establish any of the *McKay* factors, Plaintiffs fail to establish a credible threat of prosecution. *See Plunderbund*, 753 F. App'x at 372. This, of course, is a necessary element to establish injury-in-fact as part of the pre-enforcement standing analysis. *Id.* The Court therefore finds that Plaintiffs W.O and M.O. have failed to establish standing and must be dismissed as Plaintiffs.

### III

Certain constraints are unavoidable—both in the federal court system and in everyday life. While this case mainly concerns government actions that constrain everyday life, the ability of the respective parties to move forward as Plaintiffs is decided by another, more established constraint: Article III standing. Accordingly, and the Court being sufficiently advised, it is **ORDERED** as follows:

1. Plaintiffs W.O. and M.O.'s claims against Defendant Governor Andy Beshear are **DISMISSED WITH PREJUDICE**; and

2. Plaintiff Attorney General Daniel Cameron's claims remain.

This the 9th day of May, 2020.

/s/ Gregory F. Van Tatenhove
Gregory F. Van Tatenhove
United States District Judge